THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL**      **PLAINTIFFS**

**VS.**      **CIVIL ACTION NO. 4:22-cv-00062-SA-JMV**

**STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES** *in his official capacity as Governor of Mississippi*; **LYNN FITCH** *in her official capacity as Attorney General of Mississippi*; **MICHAEL WATSON** *in his official capacity as Secretary of State of Mississippi*      **DEFENDANTS**

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' EXPERTS' IMPROPER REBUTTAL DISCLOSURES

### INTRODUCTION

The Court should strike Plaintiffs' rebuttal report of Traci Burch, Ph.D. ("Dr. Burch") and a portion of their rebuttal report and corrected rebuttal report of Byron D'Andra Orey, Ph.D. ("Dr. Orey") because these disclosures exceed the scope of permissible expert rebuttal or supplementation pursuant to FRCP 26. Furthermore, the governing factors weigh in favor of striking the aforementioned improper expert disclosures and excluding any related testimony.

This Section 2 Voting Rights Act ("VRA") action challenges—for the fourth time—MISS. CODE ANN. § 9-3-1, the 1987 statute that defines the three election districts from which Mississippi elects its Supreme Court Justices, Public Service Commissioners, and Transportation Commissioners. Thirty years ago in a substantially identical case, Judge Barbour accepted

1

undisputed evidence that black and white voter turnout had achieved parity in Mississippi. *See Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1408 (S.D. Miss. 1992). Dr. Burch's initial report nevertheless claims that white turnout exceeds black turnout, based solely upon her analysis of the 2020 Presidential election, relying on figures collected by the U.S. Census Bureau in its Current Population Survey. After the defendants' expert, David Swanson, Ph.D. ("Dr. Swanson"), demonstrated that Dr. Burch had reached a false conclusion by including in her analysis children who are ineligible to vote, Dr. Burch in her rebuttal not only admitted her mistake, but disparaged the reliability of the official Census Bureau data on which she relied. She now offers entirely new calculations based on entirely new data, none of which comes from the Census Bureau.

Dr. Orey's initial report analyzed 17 elections between 2011 and 2020 in an attempt to prove that the district lines used in Mississippi Supreme Court elections grant black voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," in the words of VRA Section 2. 52 U.S.C. § 10301(b). His rebuttal report adds three new elections between 2011 and 2016. He claims that his analysis rebuts the opinion of the defendants' expert, Christopher W. Bonneau, Ph.D. ("Dr. Bonneau"), "that party rather than race explains racially polarized voting in Mississippi." Orey Corrected Rebuttal Report at 3, ¶ 7 (Ex. "A"). However, another of Plaintiffs' designated experts, former Mississippi Supreme Court Justice Oliver Diaz, had already expressed his opinion that "[p]arty politics continue to play a major role in judicial elections in general, and even more acutely in elections to the Supreme Court." Diaz Report at 16, ¶ 38 (Ex. "B"). If Plaintiffs wished to rebut the opinion of their own expert, Dr. Orey could have done that in his original report, instead of waiting until after the defendants served their expert reports. As it stands, Paragraphs 6-8 and Table 1 of Dr. Orey's rebuttal report and corrected rebuttal report fail to comport with permissible expert rebuttal.

For these reasons and those set forth herein, the aforementioned "rebuttal" disclosures of Dr. Burch and Dr. Orey are improper under FRCP 26, and the Court should strike these disclosures and exclude any related testimony at trial.

### STATEMENT OF FACTS

This motion implicates the scope of permissible expert rebuttal and supplemental disclosures under FRCP 26(a)(2)(D)(ii) and 26(e)(2), respectively.

Plaintiffs filed this action against Mississippi's Governor, Attorney General, Secretary of State—all in their official capacities only—and the State Board of Election Commissioners ("SBEC") (hereinbefore collectively "Defendants") alleging that Mississippi's three Supreme Court districts "dilute the voting strength of Black Mississippians in violation of the Voting Rights Act and the United States Constitution." Complaint at 1-2, ¶ 1 (Dkt. #1). Plaintiffs allege that Mississippi's Supreme Court districts—which have been in place since 1987—"must be redrawn so that Black voters in Mississippi have a full and fair opportunity to elect candidates of their choice." *Id.* at 2, ¶ 1.

Against all of the defendants, Plaintiffs assert a claim under Section 2 of the Voting Rights Act of 1965 (Count 1). *Id.* at 52-53, ¶¶ 140-44. Against the Governor, Attorney General, and Secretary of State, Plaintiffs assert a claim of intentional discrimination under the Fourteenth and Fifteenth Amendments to the United States Constitution (Count 2). *Id.* at 53-55, ¶¶ 145-51. Both of the aforementioned claims are asserted pursuant to 42 U.S.C. § 1983. *See id.* at 52-53.

Plaintiffs seek to have this Court "[d]eclare the district boundaries and/or districting scheme used by the State of Mississippi in electing the justices of the Mississippi Supreme Court to be in violation of Section 2 of the Voting Rights Act and the United States Constitution[.]" *Id.* at 55, ¶ A. They further seek to "[p]reliminarily and permanently enjoin the Defendants and their

3

agents from holding elections for the Mississippi Supreme Court under the existing districts[,]" and to compel Mississippi to adopt new Supreme Court districts. *Id.* at 55, ¶¶ B-D.

Consistent with the governing Case Management Order [Dkt. #47], Plaintiffs on October 3, 2022, served their expert witness disclosures, including the initial reports of two political science professors, Dr. Burch and Dr. Orey. *See* Burch Initial Report (Ex. "C") and Orey Initial Report (Ex. "D"). Consistent with an Agreed Order [Dkt. #73] extending Defendants' expert designation deadline to January 6, 2023, Defendants on that date served their expert witness disclosures, which consisted of the reports of Dr. Swanson (expert in demography) and Dr. Bonneau (expert in political science). *See* Swanson Report (Ex. "E") and Bonneau Report (Ex. "F").

On February 6, 2023, Plaintiffs served "rebuttal expert reports," see Dkt. #111, from three of their six expert witnesses, including Dr. Burch and Dr. Orey. Burch Rebuttal Report (Ex. "G"); Orey Rebuttal Report (Ex. "H"). In Dr. Burch's "rebuttal" report, she seeks to remedy deficiencies in her initial report by jettisoning her previous analysis on the grounds that her data were "unreliable," adopting an entirely new data set, and bolstering her initial opinions with entirely new analyses predicated on the new data set. Burch Rebuttal Report at 2-13 (Ex. "G"). Dr. Burch's rebuttal report was not accompanied by the underlying facts and data she relied upon in conducting her new analyses. In Dr. Orey's "rebuttal" report (as well as his "corrected" rebuttal report, see *infra*), he seeks to offer wholly-new economic inference and empirical analyses to bolster his initial opinions. Orey Rebuttal Report at ¶¶ 6-8 and Table 1 (Ex. "H").

On February 14, 2023, defense counsel sent Plaintiffs' counsel a letter requesting that Plaintiffs withdraw the aforementioned improper rebuttal disclosures by February 21, 2023. 2/14/2023 Good Faith Letter (Ex. "I"). On February 16, 2023, Plaintiffs provided Defendants with the data that Dr. Burch contends support her rebuttal report. 2/16/2023 E-mail from Plaintiffs'

4

Counsel to Defense Counsel (Ex. "J"). Following a good-faith Zoom call between counsel for all parties on February 23, 2023, Plaintiffs on February 24, 2023, served a "corrected" rebuttal report of Dr. Orey which, for purposes of the instant motion, does not materially differ from his first "rebuttal" report. Orey Corrected Rebuttal Report (Ex. "A").

On February 27, 2023, Plaintiffs' counsel advised defense counsel that Plaintiffs refuse to withdraw the disputed rebuttal disclosures. 2/27/2023 E-mail from Plaintiffs' Counsel to Defense Counsel (Ex. "K"). Upon being advised on February 28, 2023, that the parties had reached an impasse in efforts to resolve this dispute, the Court advised that a motion would need to be filed. 2/28/2023 E-mail Correspondence between Counsel and Court (Ex. "L").

Defendants file the instant motion to strike the entirety of Dr. Burch's rebuttal report and Paragraphs 6-8 and Table 1 of Dr. Orey's original and corrected rebuttal reports on the grounds that these disclosures exceed the scope of permissible expert rebuttal or supplementation pursuant to FRCP 26.

## ARGUMENT

**I. THE COURT SHOULD STRIKE REBUTTAL DISCLOSURES OF TRACI BURCH AND BYRON D'ANDRA OREY BECAUSE THEY EXCEED THE SCOPE OF PERMISSIBLE EXPERT REBUTTAL OR SUPPLEMENTATION, AND THE GOVERNING FACTORS WEIGH IN FAVOR OF EXCLUSION.**

L.U.Civ.R. 26(a)(2) "requires 'full and complete disclosure' of expert materials no later than the time specified in the Case Management Order." *Kee v. Howard L. Nations, P.C.*, Civil Action No. 4:20-cv-00127-SA-JMV, 2021 WL 5370322, at *1 (N.D. Miss. Nov. 16, 2021). "Absent a finding of just cause, failure to make full expert disclosures by the expert designation deadline is grounds for prohibiting introduction of that evidence at trial." *Id.* (quoting L.U.Civ.R. 26(a)(2)) (internal quotation marks omitted).

5

FRCP 26(a)(2)(D)(ii) "allows for a rebuttal report [by an expert] so long as the report is intended solely to contradict or rebut evidence on the same subject matter identified" in an expert report served by another party. *La. Health Care Self Ins. Fund v. United States*, Civil Action No. 12-766-JJB-RLB, 2014 WL 3720526, at *1 (M.D. La. July 25, 2014). FRCP 26(e)(2) provides for supplemental expert reports to present "additions or changes," FED. R. CIV. P. 26(e)(2), to expert information that do not constitute "material additions to the initial report." *McReynolds v. Matthews*, Civil No. 1:16-CV-318-HSO-MTP, 2017 WL 5573194, at *5 (S.D. Miss. Nov. 20, 2017) (quoting *Harmon v. Ga. Gulf Lake Charles, L.L.C.*, 476 Fed. Appx. 31, 38 (5th Cir. 2012)) (internal quotation marks omitted).

Regardless of how a plaintiff characterizes an expert report served after an initial report—*viz.*, "rebuttal" or "supplemental"—a plaintiff cannot produce "wholly new expert reports or opinions" after the expert designation deadline. *See Tarto v. St. Charles Parish*, Civil Action Nos. 12-2518, 13-614, 2014 WL 2979732, at *3 (E.D. La. July 1, 2014). *See also Matthews v. Remington Arms Co.*, Civil Action No. 07-1392, 2009 WL 1490691, at *1 (W.D. La. May 27, 2009) ("an expert report that contains new opinions based on information available prior to the expiration of the expert report deadline is not supplemental"). *Cf. Cleave v. Renal Care Group, Inc.*, No. Civ.A. 2:04CV161-P-A, 2005 WL 1629750, at *1 (N.D. Miss. July 11, 2005) ("[a] new expert affidavit which is submitted to rebut a summary judgment motion should be stricken if the new opinions differ from earlier Rule 26 report").

"The purpose of rebuttal and supplementary disclosures is not to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *DAK Americas Miss., Inc. v. Jedson Eng'g, Inc.*, Civil No. 1:18cv31-HSO-JCG, 2019 WL 8375811, at *3 (S.D. Miss. Sept. 27, 2019). Rather, FRCP 26(a) requires a party's initial expert disclosures to

6

be "complete and detailed." *See id.* (citing *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996)). "Consistent with the above, it is appropriate to strike or exclude from consideration expert affidavits which are filed after the expert disclosure deadline and which amount to new opinions." *Cooper v. Meritor, Inc.*, No. 4:16-CV-52-DMB-JMV, 2019 WL 545187, at *6 (N.D. Miss. Feb. 11, 2019).

Additionally, "[c]ourts have made it clear that supplemental expert reports cannot be used to 'fix' problems in initial reports." *Cooper Tire & Rubber Co. v. Farese*, Civil Action No. 3:02CV210-SA-JAD, 2008 WL 5104745, at *4 (N.D. Miss. Nov. 26, 2008) (collecting cases). *See also United States ex rel. Estate of Turner v. Gardens Pharmacy, LLC*, Civil No. 1:18-cv-338-HSO-RHWR, 2022 WL 1645809, at *3 n.2 (S.D. Miss. May 24, 2022) (same); *Harvey v. Caesars Entm't Operating Co.*, Civil Action No. 2:11CV194-B-A, 2014 WL 12653851, at *5 (N.D. Miss. May 6, 2014) (same). Nor can they be used "to buttress experts' initial opinions," *Harvey*, 2014 WL 12653851 at *5, or to "shore up problems in opinions contained in initial reports," *Buxton v. Lil' Drug Store Prods., Inc.*, Civil Action No. 2:02CV178KS-MTP, 2007 WL 2254492, at *5 (S.D. Miss. Aug. 1, 2007) (citing with approval *Beller v. U.S.*, 221 F.R.D. 689, 691-95 (D.N.M. 2003)) (internal quotation marks omitted). Where a plaintiff's supplemental expert report is "offered to remedy deficiencies pointed out by defendants' expert, . . . it should not be allowed." *See Harvey*, 2014 WL 12653851 at *5.

The decision of whether to strike expert disclosures as untimely or otherwise improper is within the Court's discretion and involves the consideration of four factors: (1) the explanation for the untimely/improper disclosure; (2) the importance of the testimony; (3) the potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice. *See Kee*, 2021 WL 5370322 at *3; *Harvey*, 2014 WL 12653851 at *3.

7

In the case at bar, the Court should strike the "rebuttal" report of Dr. Burch and Paragraphs 6-8 and Table 1 of the rebuttal report and corrected rebuttal report of Dr. Orey, on the grounds that these disclosures contain entirely new analyses offered to bolster Plaintiffs' experts' initial opinions, and are therefore improper pursuant to FRCP 26. Furthermore, the governing factors weigh in favor of striking the aforementioned disclosures and excluding any related testimony.

### A. The rebuttal report of Traci Burch, Ph.D., exceeds the scope of permissible expert rebuttal or supplementation.

In her rebuttal report served February 6, 2023, Dr. Burch seeks to remedy deficiencies in her initial report by jettisoning her previous analysis on the grounds that her data were "unreliable," adopting an entirely new data set as reliable, and bolstering her initial opinions with entirely new analyses predicated on the new data set. All of this exceeds the scope of permissible expert rebuttal or supplementation pursuant to FRCP 26.

Dr. Burch's initial report relied upon data obtained from the Current Population Survey Voting and Registration Supplement ("CPS data") supplied by the U.S. Census Bureau. *See* Burch Initial Report at 10, Fig. 4 (Ex. "C"). In her initial report, Dr. Burch cited CPS data in support of her opinions addressing voter turnout by race and education level. *See id.* at 10. Accordingly, in Dr. Swanson's (defense expert) report responding to Dr. Burch's initial opinions, he also presented opinions on voter turnout that relied upon his own analysis of CPS data. Swanson Report at 67-82 (Ex. "E"). Dr. Swanson opined that the voter turnout opinions that Dr. Burch presented in her initial report were predicated on a flawed analysis of CPS data. *Id.* at 11.

In her rebuttal report served February 6, 2023, Dr. Burch acknowledges multiple errors in her analysis of the CPS data. Specifically, she states that "Dr. Swanson is correct that the estimates in my initial report reflect a calculation error" as it relates to the inclusion of children aged 15-17 in an educational attainment variable. Burch Rebuttal Report at 3 (Ex. "G"). Dr. Burch further

8

states that in preparing her initial report, she erroneously "thought that the educational attainment variable that I was using excluded children." *Id.* She also admits that she "calculated total turnout for both racial groups incorrectly." *Id.* In an effort to 'fix' these problems with her initial report, Dr. Burch states in her rebuttal report that she "now think[s]" that the CPS data—which she relied upon to support the voter turnout opinions presented in her initial report—"is not reliable as a benchmark for voter turnout" or "for voter turnout by race." *See id.* at 2, 4. Dr. Burch further asserts in her rebuttal report that "Dr. Swanson's analysis is flawed" as it relates to voter turnout by race because he, too, used the CPS data in formulating his opinions. *See id.* at 2-3.

Having now rejected—as "unreliable"—the CPS data that she herself relied upon in her initial report, Dr. Burch in her rebuttal report states that she has "conducted additional analyses which employed alternative methods of looking at voter turnout by race." *Id.* at 4. These analyses are entirely new and are purportedly predicated on data obtained from something called the "2020 Cooperative Election Study (CES)" ("CES data")—a body of data that is nowhere used or identified in Dr. Burch's initial report. *Id.* Dr. Burch now states that she has "employ[ed] logit regression analysis" to analyze this newly-identified CES data, which resulted in new regression tables and probability statistics related to voter turnout by race. *See id.* at 4-6. Dr. Burch uses this new analysis in her rebuttal report to bolster her opinion "that Black voter turnout is lower than white turnout." *See id.* at 4.

Dr. Burch further states in her rebuttal report that Dr. Swanson's opinion regarding voter turnout by educational attainment is "inaccurate because it relies on the CPS" data, *id.* at 7—which, again, she herself relied upon in formulating the opinions reflected in her initial report. Dr. Burch states that due to her newly-asserted rejection of the CPS data, "for *this* report [i.e., her rebuttal report], I seek to *reinforce* and *corroborate* my conclusions regarding the effects of educational

9

discrimination on Black voter turnout by deploying multiple regression analysis on the CES" data, i.e., the newly-identified data set that she did not use in formulating the opinions presented in her initial report. *Id.* at 7 (italics added). Dr. Burch's rebuttal report goes on to assert that her initial opinions are buttressed by the new regression analysis that she performed on the newly-identified CES data. *See id.* at 7-9; 8, Fig. 2; 16, Appx. Table 2.

Further, Dr. Burch states in her rebuttal report that "[t]o further bolster [her] CES analysis," she is presenting "a second method of estimating the racial gap turnout"—namely, "ecological inference (EI)" ("EI"). *Id.* at 9. She describes EI as "us[ing] Bayesian statistical methods to estimate voting behavior," *id.* at 10, a process she describes as follows:

> I calculate block group voter turnout by geocoding the Mississippi voter registration file to census block groups, then aggregating up to produce counts of votes from each block group for the November 2020 General election. I use census block group data on the citizen voting age population by race, distinguishing non-Hispanic white population from the non-White population. I also break out the data for the block groups in the counties of the Supreme Court District 1 (Central District) and perform EI separately.

*Id.* at 10. No such EI analysis appears anywhere in Dr. Burch's initial report, as Dr. Burch did not perform any EI analysis in formulating the opinions presented in her initial report. Dr. Burch's rebuttal report proceeds to assert that her initial opinions are supported by her newly-performed EI analysis. *See id.* at 9-12; 11, Fig. 4; 14, Table 1. Touting opinions that are purportedly bolstered by her newly-performed regression and EI analyses using newly-identified CES data, Dr. Burch further opines that Dr. Swanson's "estimates of turnout are unreasonable." *See id.* at 12.

Finally, Dr. Burch's "rebuttal" report purports to bolster her opinion regarding voter wait times, which she asserts affect voter turnout. *See id.* at 12-13. This effort is likewise predicated exclusively on Dr. Burch's newly-performed analysis of newly-identified CES data. *See id.* at 12-13; 13, Fig. 5.

Defendants expended considerable time and financial resources to enable their applied demography expert, Dr. Swanson, to analyze and respond to the voter turnout opinions that Dr. Burch presented in her initial report. In reliance on Dr. Burch's use of CPS data as the basis for her voter turnout opinions, Dr. Swanson likewise analyzed CPS data in formulating his responsive opinions. As set forth above, Dr. Swanson demonstrated that Dr. Burch's analysis of CPS data was plagued by multiple errors, which she now acknowledges. In an effort to 'fix' the problems with her initial report, Dr. Burch now says—in her rebuttal report—that we must throw out the entire body of data that she used initially (i.e., the CPS data from the U.S. Census Bureau) and start over with an entirely new data set (i.e., the CES data). Working from her wholly-new opinion that CPS data is unreliable, Dr. Burch now seeks to bolster her initial opinions with wholly-new analyses—i.e., regression analysis and EI analysis—that utilize the newly-identified CES data in lieu of CPS data.

There can be no question that none of these purported "rebuttal" disclosures of Dr. Burch is proper expert rebuttal or supplementation pursuant to the authorities set forth above. Plaintiffs cannot establish otherwise.

**B. Portions of the rebuttal report of Byron D'Andra Orey, Ph.D., likewise exceed the scope of permissible expert rebuttal or supplementation.**

At Paragraphs 6-8 and Table 1 of his rebuttal report served February 6, 2023, and his "corrected" rebuttal report served February 24, 2023, Dr. Orey seeks to offer wholly-new EI and empirical analyses to bolster his initial opinions. These portions of Dr. Orey's rebuttal report likewise exceed the scope of permissible expert rebuttal and/or supplementation.

In Paragraph 6 of his rebuttal report and corrected rebuttal report, Dr. Orey states that he has "conducted additional EI analyses on two other endogenous/quasi-endogenous contests," which he further describes in Table 1. Orey Rebuttal Report at 2, ¶ 6 (Ex. "H"); Orey Corrected

11

Rebuttal Report at 2, ¶ 6 (Ex. "A"). In Paragraph 7 of both rebuttal reports, Dr. Orey states that he "ha[s] also conducted an empirical analysis to provide evidence that blacks and whites prefer different candidates." *Id.* at 3, ¶ 7. Finally, in Paragraph 8 of both rebuttal reports, Dr. Orey states that "[c]onsistent with my previous report submitted on October 3, 2022, I conduct an EI analysis of the 2011 primary election," which he further describes in Table 1. *Id.* at 3, ¶ 8. Table 1 describes Dr. Orey's analyses of the three new elections referenced in Paragraphs 6-8 of his rebuttal report. None of these elections was among the 17 elections analyzed in Dr. Orey's initial report. *See id.* at 3, Table 1. *See also* Orey Initial Report at 12-14, Tables 1-3 (Ex. "D").

All of these newly-performed analyses are presented in an effort to bolster Dr. Orey's initial opinions concerning racial polarization and are therefore improper as rebuttal/supplemental disclosures. Plaintiffs cannot show otherwise.

  C. **The governing factors weigh in favor of striking Dr. Burch's rebuttal report and Paragraphs 6-8 and Table 1 of Dr. Orey's rebuttal and "corrected" rebuttal reports.**

  1. **Plaintiffs have no reasonable explanation for the improper rebuttal disclosures of Dr. Burch and Dr. Orey.**

Dr. Burch does not contend that the newly-identified CES data were unavailable at the time she prepared her initial report. Nor does she contend that any intervening circumstances rendered the CPS data "unreliable." Rather, she claims that she was "unaware" of a single article that causes her to "now think" that CPS data are unreliable; she admits that the article in question was published *before* she wrote her initial report, but that she did not find it until research that she conducted *after* receiving Dr. Swanson's report. Burch Rebuttal Report at 4 (Ex. "G"). Dr. Burch had every opportunity to conduct any research and analysis that she deemed necessary *before* submitting opinions that she knew would be investigated by the defendants' experts. Her failure to do the careful, thorough work needed to supply "full and complete" disclosures by the October

12

3, 2022, deadline specified in the governing Case Management Order [Dkt. #47] is not susceptible to any reasonable explanation.

Likewise, there was nothing to prevent Dr. Orey from performing his additional analyses regarding three new elections *before* he received Dr. Bonneau's report. Dr. Orey's initial report analyzed 17 elections between 2011 and 2020 in an effort to prove that the current Mississippi Supreme Court districts afford black voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," in the words of VRA Section 2. 52 U.S.C. § 10301(b). His rebuttal report adds three new elections between 2011 and 2016. He claims that his analysis rebuts the opinion of Dr. Bonneau "that party rather than race explains racially polarized voting in Mississippi." Orey Corrected Rebuttal Report at 3, ¶ 7 (Ex. "A"). However, another of Plaintiffs' designated experts, former Mississippi Supreme Court Justice Oliver Diaz, had already expressed his opinion that "[p]arty politics continue to play a major role in judicial elections in general, and even more acutely in elections to the Supreme Court." Diaz Report at 16, ¶ 38 (Ex. "B"). If Plaintiffs wished to rebut the opinion of their own expert, Dr. Orey could have done that in his original report, instead of waiting until after the defendants served their expert reports.

There is no reasonable explanation for the improper rebuttal disclosures at issue. Thus, the first factor weighs in favor of striking the disputed rebuttal disclosures and excluding any related testimony at trial.

**2. Because the instant motion does not seek to strike either expert's initial report, the importance of the challenged testimony is diminished.**

The instant motion does not seek to prevent Dr. Burch or Dr. Orey from testifying *at all* at trial, nor does it seek to strike their initial reports or any part of Dr. Orey's rebuttal report or corrected rebuttal report beyond those portions identified herein. At most, this factor is neutral.

13

### 3. Defendants will be unfairly prejudiced if forced to incur the additional time and expense of responding to Plaintiffs' improper rebuttal disclosures.

The demographic analysis that underpins the expert opinions at issue in this VRA Section 2 case is complex and highly specialized. Thus, even for qualified experts, performing such analysis is not an expeditious or inexpensive proposition. To the contrary, it is both time-consuming and costly. As noted above and described more fully below, Defendants expended considerable time and financial resources to enable their applied demography expert, Dr. Swanson, to analyze and respond to the voter turnout opinions that Dr. Burch presented in her initial report.

In her initial report, Dr. Burch offered the following opinion: "Black people in Mississippi have had less access to quality education and therefore have lower educational attainment for the reasons discussed in this section; this lower educational attainment leads to lower voter turnout." Burch Initial Report at 10 (Ex. "C"). The only data supporting her opinion, at page 10 of her initial report, that an "overall gap in turnout between Black and white Mississippians exists" was her calculation that "56.1% of white Mississippi citizens voted in the 2020 general election, compared with 53.0% of Black Mississippi citizens." *Id.* Figure 4 shown on page 10 of Professor Burch's initial report shows that she relied for that calculation on CPS data, *viz.*, official data collected by the United States Census Bureau. *Id.*

It was thus part of Dr. Swanson's assignment, as a defense expert, to determine the accuracy of Dr. Burch's opinion that an "overall gap in turnout between Black and white Mississippians exists." *See* Decl. of Dr. Swanson (Ex. "M"). His investigation was composed of two parts. First, he examined the CPS data to determine if it in fact supported Dr. Burch's calculation that a greater percentage of white Mississippi citizens than black Mississippi citizens voted in the 2020 general election. Second, he examined additional sources of information to determine whether any such gap in turnout actually exists. *Id.*

14

Dr. Swanson's analysis of the CPS data revealed that in every year since 2012, black voter turnout exceeded white voter turnout in Mississippi. *Id.* It also revealed that the CPS data do not support Dr. Burch's opinion regarding voter turnout for the 2020 election. Upon analyzing the CPS data to identify the source of Dr. Burch's error, Dr. Swanson concluded that she had inaccurately included individuals under 18 years of age as eligible voters. *See id.* By using the wrong number of eligible voters, she necessarily determined the wrong percentage of participation by actually eligible voters. *See id.* Dr. Swanson's analysis of CPS data necessarily took a great deal of time and effort on his part. *See id.*

In a further effort to test Dr. Burch's opinion that an "overall gap in turnout between Black and white Mississippians exists," Dr. Swanson examined an additional set of data. *Id.* The Social Science Research Center at Mississippi State University has conducted annual statewide surveys of registration and voting frequency from 2015 to 2021. *Id.* Dr. Swanson analyzed this data and determined that it, too, indicated that black turnout generally exceeds white turnout in Mississippi. *Id.* It took a substantial amount of time and effort for Dr. Swanson to locate and examine this additional source of data. *Id.*

In her rebuttal report, Dr. Burch admits that she miscalculated turnout in the 2020 general election because she included children in her analysis. Burch Rebuttal Report at 3 (Ex. "G"). However, although she relied on CPS data in her initial report, she says in her rebuttal report that "turnout estimates in the CPS are unreliable." *Id.* at 4. Thus, she repudiates not only her own calculation, but also the CPS data on which she and Dr. Swanson both relied. She claims that the CPS data are unreliable because the Census Bureau collects them by survey, the same method also used by Mississippi State. *Id.* at 2. Decl. of Dr. Swanson (Ex. "M"). Instead, she relies for the first time on something called the "2020 Cooperative Election Study (CES)." Burch Rebuttal

Report at 4 (Ex. "G"). She deploys this newly-identified data mathematically to conclude "that 60% of White respondents voted in the 2020 General Election, compared with 46% of Black Mississippi respondents." *Id.* at 6. On the basis of this new analysis of a single election, she adheres to her opinion, restated in her rebuttal report, "that White people have a statistically significant advantage in voter turnout." *Id.* at 11.

In order to examine the veracity of Dr. Burch's opinion, Dr. Swanson will need to examine the new data source—*viz.*, the CES Data—on which she relies for the first time, as well as the new models she has built from new data sources. *See* Decl. of Dr. Swanson (Ex. "M"). Acquisition and analysis of an entirely new source of data, together with checking Dr. Burch's use of that data, will require a substantial amount of time and effort on Dr. Swanson's part. As set forth in detail in his declaration being filed herewith as Ex. "M," Dr. Swanson estimates that it would take between 164 to 180 man-hours of additional work to critically examine and respond in writing to the results presented in Dr. Burch's rebuttal report (this is in addition to the eight hours he has already spent reading and assessing Dr. Burch's rebuttal report for purposes of preparing his attached declaration). All of this will result in additional expense that Defendants would not otherwise be forced to bear but for Dr. Burch's improper rebuttal report.

Similarly, Dr. Bonneau will be required to perform additional research and analysis to investigate the veracity of the EI and empirical analyses performed by Dr. Orey in connection with three newly-analyzed elections. As noted above, all of this was presented for the first time in Dr. Orey's rebuttal report. The additional work now required of Dr. Bonneau will likewise require time, effort, and expense that Defendants should not be saddled with under FRCP 26 and the above-cited standards governing expert witness disclosures.

16

Where a defendant is forced to incur additional expense due to a plaintiff's improper expert disclosures, the prejudice factor weighs in favor of the defendant and exclusion of the challenged disclosures. *Cf. Raymond James Trust, N.A., Trustee of E.C. Care Trust v. Natchez Hosp. Co.*, Civil Action No. 5:19-CV-103-DCB-MTP, 2021 WL 2556593, at *4 (S.D. Miss. June 22, 2021). Such is the case here.

### 4. A continuance would not cure the prejudice inherent in Plaintiffs' improper rebuttal disclosures.

To date, neither party has sought a continuance in this matter. Regardless, a continuance "would not cure the prejudicial expenditures of time and money," *Raymond James*, 2021 WL 2556593 at *4, necessitated by Plaintiffs' improper rebuttal disclosures and thus "would not be helpful in resolving this matter," *id*. Therefore, this factor likewise weighs in favor of striking Plaintiffs' improper rebuttal disclosures.

### CONCLUSION

Plaintiffs should not be permitted to engage in a proverbial "head fake" that will ultimately cost the State of Mississippi thousands of dollars to defend. But that is exactly what will happen if Defendants' experts are forced to (a) start over and formulate opinions from scratch using a new data set and (b) address newly-performed analyses—all at the whim of two experts who failed to take appropriate care the first time around. For all these reasons, the Court should strike the entirety of Dr. Burch's rebuttal report and Paragraph 6-8 and Table 1 of Dr. Orey's rebuttal report and corrected rebuttal report and exclude any related testimony at the trial of this matter.

The Court should suspend the remaining case management deadlines pending a ruling on the instant motion. In the event the motion is denied in whole or in part, Defendants request a reasonable extension of time for their experts to prepare written surrebuttals to any unstricken portions of the rebuttal reports of Dr. Burch and Dr. Orey.

THIS the 10th day of March, 2023.

        Respectfully submitted,

        STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI, AND MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF MISSISSIPPI, DEFENDANTS

        By:    LYNN FITCH, ATTORNEY GENERAL
                  STATE OF MISSISSIPPI

        By:    <u>s/Rex M. Shannon III</u>
                  REX M. SHANNON III (MSB #102974)
                  Special Assistant Attorney General

        REX M. SHANNON III (MSB #102974)
        GERALD L. KUCIA (MSB #8716)
        LINDSAY THOMAS DOWDLE (MSB #102873)
        STATE OF MISSISSIPPI
        OFFICE OF THE ATTORNEY GENERAL
        CIVIL LITIGATION DIVISION
        Post Office Box 220
        Jackson, Mississippi 39205-0220
        Tel.: (601) 359-4184
        Fax: (601) 359-2003
        rex.shannon@ago.ms.gov
        gerald.kucia@ago.ms.gov
        lindsay.dowdle@ago.ms.gov

        MICHAEL B. WALLACE (MSB #6904)
        WISE CARTER CHILD & CARAWAY, P.A.
        Post Office Box 651
        Jackson, Mississippi 39205-0651
        Tel.: (601) 968-5500
        Fax: (601) 944-7738
        mbw@wisecarter.com

        ATTORNEYS FOR DEFENDANTS STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI, LYNN

FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI, AND MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF MISSISSIPPI

## **CERTIFICATE OF SERVICE**

I, Rex M. Shannon III, Special Assistant Attorney General and one of the attorneys for the above-named State Defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 10th day of March, 2023.

s/Rex M. Shannon III
REX M. SHANNON III
