**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**DYAMONE WHITE, et al.,**                                    **PLAINTIFFS**

**VS**.                                    **Civil Action No. 4:22-cv-00062-SA-JMV**

**STATE BOARD OF ELECTION**
**COMMISSIONERS, et al.,**                                    **DEFENDANTS**

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO STRIKE CERTAIN EXPERT DISCLOSURES**

---

## INTRODUCTION

The Court should deny Defendants' Motion to Strike.  The challenged February 6, 2022 report of Traci Burch, Ph.D. and the contested portion of the challenged February 6, 2022 report of Byron D'Andra Orey, Ph.D. are permissible disclosures under Fed. R. Civ. P. 26.  Dr. Burch's challenged report addresses an error in her initial report, and the portion of Dr. Orey's challenged report responds directly to Defendants' expert's contentions.  Moreover, should the Court find the challenged disclosures exceed the bounds of proper rebuttal or supplementation, the proper remedy is authorizing Defendants' experts to respond to these disclosures, not the drastic remedy of striking disclosures and testimony important to Plaintiffs' case.

This is a civil rights case challenging the districts used to elect justices to the Mississippi Supreme Court under Section 2 of the Voting Rights Act.  Those three at-large districts have existed in their present form for over 36 years, since 1987, and in substantially similar form for more than 100 years.  There have only been four Black Supreme Court justices in the Court's history, each serving successively in the same seat in the central district, District 1.  No Black candidate has ever won an election to the Court without first being appointed by the Governor to

fill a vacancy and thereafter running as an incumbent. Thus, the composition of the nine-member Mississippi Supreme Court has never been more that 11% Black, whereas the population of Mississippi is 38% Black. Racially polarized voting is pervasive in Mississippi, and Black voters are denied a fair opportunity to elect candidates of their choice under the 36-year-old Supreme Court districting scheme. Plaintiffs seek to change that. As a result of demographic changes in recent decades, the boundaries of Supreme Court District 1 can and should be redrawn consistent with traditional districting principles to create a district with a majority-Black voting age population where Black voters can elect candidates of their choice.

Expert testimony is central to Section 2 claims under the Voting Rights Act. In this case, the Court proposed and the parties agreed to an expedited expert discovery schedule in which Plaintiffs' expert disclosures would be due on October 3, 2022 and Defendants' expert disclosures would be due on December 1, 2022. Plaintiffs' initial expert disclosures were timely made on October 3, 2022. Defendants thereafter requested an extension of their disclosure deadline and the parties ultimately agreed to extend that deadline to January 6, 2023. The responsive reports at issue here were filed 30 days later, on February 6, 2023, in response to Defendants' disclosures. No expert depositions have yet occurred, and the close of discovery is scheduled for April 19, 2023.

The instant motion principally concerns the report submitted on February 6, 2023 by Dr. Traci Burch, a political science professor at Northwestern University, who was retained by Plaintiffs to address matters including the relative rates of voter participation among Black and white Mississippians. Among other things, Dr. Burch opined in her initial October 3 report that Black Mississippians have relatively lower rates of voter participation than white Mississippians, and that this lower participation rate correlates with Black Mississippians' relative lower levels of

educational attainment, itself a legacy of institutional racial discrimination. In her analysis, Dr. Burch used a data source involving self-reported survey responses, but made a calculation error that resulted in data related to persons under 18 years old being included in the analysis. This in turn had the effect of suppressing rates of voter turnout, since persons below voting age necessarily do not vote.

Defendants' expert Dr. David A. Swanson identified this error in his report dated January 6, 2023. However, the results he presented, using the same source while removing persons under the age of majority, showed voter turnout far in excess of the turnout reflected in the official data maintained by the Mississippi Secretary of State. Thus, faced with (i) the results of her initial report, tainted by this calculation error and (ii) Dr. Swanson's results, which cannot be reconciled with official turnout data, Dr. Burch conducted additional analyses of voter turnout by race using data sources that did not wholly rely on self-reported survey responses. The results of those analyses are reflected in Dr. Burch's February 6 Report, and support Dr. Burch's original conclusion—that Black voter turnout in Mississippi is lower than white voter turnout, and that this can be explained with reference to the two populations' relative levels of educational attainment.

Defendants' motion to strike Dr. Burch's February 6 report should be denied. The Federal Rules favor resolution of disputes on the merits. An expert who makes an error should be allowed to correct the error, particularly when the error is uncovered early in the expert discovery process, prior to expert depositions, *Daubert* motions, or summary judgment proceedings. Indeed, Fed. R. Civ. P. 26(e) requires supplementation to correct errors. In this case, correction of the error required further analysis because the corrected result showed that the underlying data source was unreliable for this purpose.

Under these circumstances, Plaintiffs do not dispute that Defendants should have the opportunity to respond to the analysis presented by Dr. Burch in her February 6 report. But striking the February 6 report would effectively bar Plaintiffs from introducing statistical evidence of relative voter turnout between Black and white voters, a significant issue in this case. It would also leave unrebutted Dr. Swanson's opinion that Mississippi voters turned out at a rate plainly belied by the objective data. The far more just and appropriate result is to instead allow Defendants to serve a rebuttal to Dr. Burch on this point, with depositions of Drs. Burch and Swanson to follow. Such supplementation should not require the amount of time that Defendants suggest.

Defendants also seek to strike three paragraphs from the second report of Dr. Byron D'Andra Orey. Those three paragraphs contain analyses of three elections, conducted in response to Defendants' expert's contention that partisanship rather than race explains the racially polarized voting patterns Dr. Orey observed. This is proper rebuttal, and Defendants' contrary contentions—including their assertions that this analysis is inconsistent with statements made in the report of another of Plaintiffs' experts, Oliver Diaz—improperly bring merits questions to bear on this procedural motion. Defendants can properly probe Dr. Orey's analyses through deposition and cross-examination. Their motion should be denied as to Dr. Orey as well.

Finally, to the extent the Court deems it appropriate to provide additional time for Defendants to submit further expert disclosures, there is adequate time in the schedule to do so without continuing the trial date. However, to the extent the Court determines the trial date would need to be continued, such a continuance, in this less than one-year-old case, would be superior to the alternative of preclusion of important expert testimony.

## BACKGROUND

### A.    Plaintiffs' Claims

Plaintiffs brought this action because the district boundaries that have been in place since 1987 for Mississippi Supreme Court elections dilute the voting strength of Black Mississippians, in violation of Section 2 of the Voting Rights Act.  *See generally* Compl., Dkt. #1.[1]  Mississippi uses three at-large districts to elect three candidates per district.  Compl. ¶ 36.  This overall districting scheme dates back at least to Mississippi's 1890 Constitution, and the district lines have remained materially the same, and were most recently modified in 1987, 36 years ago.  *Id.* ¶ 37. The State Supreme Court has had a total of four Black justices in its history, all of whom have initially acceded to the bench via gubernatorial appointments, and all successively to the same seat (District 1, Place 2).  *E.g.*, *id.* ¶ 52.  Thus, the nine-member Court has never had more than a single Black justice at the same time, and throughout its history, the Court's membership has either been 0% or 11% Black, despite the population of Mississippi being nearly 40% Black at present.

District 1—the central district, which includes the city of Jackson and parts of the Delta region—has a Black voting age population of approximately 49%, and could thus "be brought to over 50% in any number of configurations and without splitting any county lines or altering the overall orientation of the districts, such that Black voters would have the opportunity to elect candidates of choice in District 1."  Compl. ¶ 58; *see also id.* ¶ 49 ("Today . . . District 1 can readily be redrawn as majority-Black consistent with traditional districting principles and without changes to the overall three-district framework for Mississippi Supreme Court elections."); Cooper Rpt. ¶¶

---

[1]    Plaintiffs also brought a claim under the Fourteenth and Fifteenth Amendments to the U.S Constitution, but in an effort to streamline this case are presently seeking to amend their complaint so as to voluntarily dismiss this claim.  *See* Plaintiffs' Unopposed Motion Ror Leave To File Amended Complaint Dismissing Count II.

11, 44, 49, Dkt. #69-10 Ex. J. A redrawn, majority-minority District 1 could also unite the Mississippi Delta region, a clear community of interest currently split between District 1 and District 3. *Id.* ¶¶ 12, 38; Cooper Rpt. ¶ 49, Dkt. #69-10 Ex. J.

### B. Claims Under Section 2 of the Voting Rights Act

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Under *Gingles*, Plaintiffs must prove that (i) "the racial group is sufficiently large and geographically compact to constitute a majority"; (ii) "the racial group is politically cohesive"; and (iii) "the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Thomas v. Bryant*, 366 F. Supp. 3d 786, 800 (S.D. Miss. 2019) (internal quotations omitted).

Once those three threshold conditions are established, courts consider whether, based on the totality of the circumstances, Black voters "do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44.

Relevant to the totality-of-the-circumstances question are the "Senate factors," a non-exhaustive list of factors drawn from the Senate Report to the 1982 amendments to the Voting Rights Act:

> 1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. The extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

6

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thomas*, 366 F. Supp. 3d at 800-01, quoting *Gingles*, 478 U.S. at 36-37. *See also* S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pages 28-29.

Expert testimony is relevant to both the *Gingles* test and the Senate Factors. *See, e.g.*, *Montes v. City of Yakima*, No. 12-CV-3108-TOR, 2015 WL 11120966, at *8 (E.D. Wash. June 19, 2015) ("Voting Rights Act litigation requires an extensive factual investigation involving expert analysis of demographics and electoral histories, as well as the relevant Senate factors."); *Westwego Citizens for Better Gov't v. Westwego*, 872 F.2d 1201, 1206 (5th Cir. 1989) ("The second and third [*Gingles*] elements are usually established by statistical evidence of racially polarized voting by the voters in the relevant political unit."); *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *71 (N.D. Ala. Jan. 24, 2022) (relying on "testimony from two expert witnesses . . . about these Senate Factors."), *cert. granted before judgment sub nom. Merrill v. Milligan*, 142 S. Ct. 879 (2022); *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 806-07 (M.D. La. 2022) ("Plaintiffs offered several expert witnesses who presented testimony relevant to the Court's consideration of the Section 2 totality of the circumstances inquiry, which is analyzed by reference to the Senate Factors, *inter alia*. The first such witness was Dr. Traci Burch, tendered as an expert in the fields of political behavior, political participation, and barriers to voting.").

As it regards Dr. Burch, the instant motion primarily concerns expert testimony regarding Senate Factor 5—"The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *See Thomas*, *supra*. The Fifth Circuit has found it significant, in considering this factor, whether "the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'" *NAACP v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001). The analysis Defendants seek to strike concerning relative voter turnout by race squarely addresses this point; if stricken, Plaintiffs would lack expert testimony on this issue.

As it regards Dr. Orey, Defendants' motion concerns *Gingles* factors (ii) and (iii)—whether "the racial group is politically cohesive," and whether "the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Thomas*, *supra*. Defendants' expert Dr. Christopher Bonneau argues that partisanship rather than race explains the respective voting patterns of Black and white Mississippians—*i.e.*, Black Mississippians simply vote for the Democratic party, while white Mississippians vote for the Republican party. The three paragraphs Defendants seek to strike respond to these assertions by providing examples of elections in which partisanship is not a plausible alternative explanation.[2]

---

[2] In particular, the three paragraphs discuss Dr. Orey's analysis of three election contests beyond those contests analyzed in his initial report. One is the 2016 District 1 Supreme Court contest, a non-partisan race that nevertheless exhibited racially polarized voting. Another is a Democratic primary contest where Black and white voters in the same party exhibited polarized voting in a head-to-head contest between a Black candidate and a white one. The third is the 2015 Central District Public Service Commission contest. Orey Feb. 6 Rpt., ¶¶ 6–8, Dkt. 119-9 Ex. H.

### C.     Procedural History

The operative Case Management Order in this case, entered on July 19, 2022, provided that Plaintiffs' expert disclosures would be due on October 3, 2022, towards the outset of fact discovery, and that Defendants' disclosures would be due on December 1, 2022, sixty days later. *See* Case Management Order, p. 4 ¶ 7(E), Dkt. #47.  Discovery is scheduled to conclude on April 19, 2023; dispositive and *Daubert* motions are to be filed by June 1, 2023; the pretrial conference is scheduled for November 2, 2023, and trial is scheduled for December 4, 2023.  *Id.* at p. 4-5 ¶¶ 7, 8.

Plaintiffs served their expert disclosures on October 3, 2022, designating six experts in total.  Defendants subsequently sought an extension of their deadline, and the parties agreed to a thirty-six day extension from December 1, 2022 to January 6, 2023.  On January 6, 2023, Defendants disclosed two experts.  Consistent with Fed. R. Civ. P. 26(a)(2)(d)(ii), Plaintiffs served responsive reports on February 6, 2023.  On February 14, 2023, Defendants sent Plaintiffs a letter regarding the issues that are the subject of this motion.  The parties thereafter met and conferred, and on February 28, 2023 Defendants informed the Court of this dispute.  Defendants filed the instant motion on March 10, 2023.  *See* Dkt. #119, 120 ("Mem.").

### <u>ARGUMENT</u>

Motions to strike or exclude rebuttal or supplemental expert reports on the grounds of untimeliness are analyzed under a two-part framework.  The threshold inquiry is whether the challenged report is a proper rebuttal or a permissible supplement to a timely-disclosed initial report, or whether it should be considered a new opinion that is untimely disclosed.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL 1446, 2007 WL 5023541, at *7 (S.D. Tex. Feb. 1, 2007) ("*In re Enron*").  Under Fed. R. Civ. P. 26(a)(2)(D)(ii), rebuttal disclosures are due "within 30 days after the other party's disclosure."  The February 6, 2023 reports at issue here

were filed within 30 days of Defendants' disclosures on January 6, 2023. As to supplementation, under L.U.R. Civ. 26(a)(2)(C), supplemental reports are due no later than the discovery cut-off date, here April 19, 2023. If a challenged expert disclosure, made after the initial date for the party to designate its experts, is a proper and timely rebuttal or supplementation, the inquiry ends and the motion should be denied.

Should, however, the Court determine the challenged report exceeds the bounds of proper rebuttal or supplementation, "the Court must determine whether the untimely disclosure … was substantially justified or harmless error to see if it is excepted from being excluded from evidence." *In re Enron*, 2007 WL 5023541, at *7. In making this determination, a district court considers "the following four factors: (1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman v. MacDonald*, 893 F.2d 787, 790-91 (5th Cir. 1990). Under this analysis, where the testimony at issue is important and a continuance would cure much of the prejudice, if any, to the opposing party, exclusion is "disproportionately harsh." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 374 (5th Cir. 2016).

For the reasons discussed below, analysis of these factors demonstrates that the proper remedy for any disclosure violation, to the extent one exists, is a continuance, not the drastic remedy of exclusion. Exclusion would not serve "the interests of justice," which "are better served by deciding cases on their merits." *JCKP, LLC v. Berkley Reg'l Specialty Ins. Co.*, No. 2:14-cv-117-KS-MTP, 2015 WL 5794428, at *2 (S.D. Miss. Oct. 2, 2015); *see also id.* ("The Fifth Circuit has 'repeatedly emphasized that a continuance is the preferred means of dealing with a party's attempt to designate a witness out of time.'") (quoting *Betzel v. State Farm Lloyds*, 480 F.3d 704,

708 (5th Cir. 2007)); *Sun Bank v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) ("The Federal Rules of Civil Procedure are designed for the just, speedy, and inexpensive disposition of cases on their merits, not for the termination of litigation by procedural maneuver.").

## I. THE CHALLENGED FEBRUARY 6 REPORTS ARE PROPER REBUTTAL AND SUPPLEMENTATION

"The purpose of rebuttal and supplementary disclosures is just that—to rebut and to supplement" *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996). However, since the Federal Rules do not define what constitutes a supplemental expert report, "the line between supplemental opinions and new opinions is not always clear, and the decision regarding how to make the distinction . . . depends on the facts of the case." *Charles v. Sanchez*, No. EP-13-CV-193-DCG, 2015 WL 808417, at *8 (W.D. Tex. Feb. 24, 2015) (quoting *In re Enron*, 2007 WL 5023541, at *8); *see also Hercules Tire & Rubber Co., Inc. v. Robison Tire Co.*, No. 2:16-CV-27-KS-MTP, 2019 WL 12059352, at *3 (S.D. Miss. June 10, 2019) ("The line between what constitutes a proper rebuttal methodology and an improper new argument on rebuttal is often unclear and it is frequently a 'very close case' as to whether testimony is proper rebuttal.") (quoting *United States v. 9.345 Acres of Land*, No. 11-803-JJB-EWD, 2016 WL 5723665, at *3 (M.D. La. Sept. 30, 2016). In their memorandum, Defendants cite several cases concerning the scope of permissible rebuttal or supplementation that suggest a narrow scope. A review of the relevant authorities, however, shows that a case-specific assessment is needed, and that supplementation in order to correct mistakes, including those identified by an opposing expert, is appropriate.

First, the cases Defendants rely on involve circumstances significantly different than those at issue here. In particular, those authorities involve disclosures served after the close of discovery; in response to summary judgment or *Daubert* motions; on the eve of trial in long-running cases;

11

or disclosures made to supplement initial disclosures that served as knowingly deficient placeholders. *See Cooper Tire & Rubber Co. v. Farese*, No. 3:02CV210-SA-JAD, 2008 WL 5104745, at *4 (N.D. Miss. Nov. 26, 2008) (second report setting forth new damages analyses served after expert's deposition and after expiration of discovery deadline); *United States ex rel. Estate of Turner v. Gardens Pharmacy, LLC*, Civil No. 1:18-cv-338-HSO-RHWR, 2022 WL 1645809, at *3 n.2 (S.D. Miss. May 24, 2022) (party submitted "knowingly deficient" report rather than seeking extension of the deadline until necessary information could be obtained); *Harvey v. Caesars Entm't Operating Co.*, Civil Action No. 2:11CV194-B-A, 2014 WL 12653851, at *5 (N.D. Miss. May 6, 2014) (same) (addressing supplementation made after close of discovery and "on the eve of trial" in case that had been pending for nearly three years); *Buxton v. Lil' Drug Store Prods., Inc.*, No. 2:02CV178KS-MTP, 2007 WL 2254492, at *5 (S.D. Miss. Aug. 1, 2007) (supplementation at issue disclosed "eight months after the deadline for [plaintiff's] expert reports and seven months after service of defendants' expert reports, not to mention on the eve of defendants' final summary judgment briefing.").

Here, by contrast, the challenged February 6 Reports were served 30 days after Defendants' expert disclosures, well in advance of the close of discovery. No expert depositions have been taken or scheduled and no motions (save the instant motion) have been filed that implicate expert testimony. This case was filed on April 25, 2022, less than a single year ago. No prior continuances have been requested, and the sole request for an extension of a deadline in the Case Management Order was Defendants' request to extend their sixty-day period to serve their expert disclosures; the parties agreed to a 36-day extension—the result of which was that Plaintiffs' expert disclosures in response to Defendants' experts were served on February 6, 2023 as opposed to January 2, 2023.

In such circumstances, courts have found that a supplemental report is proper "when it is in response to questions or challenges to the expert's opinion raised by the opposing party." *Charles*, 2015 WL 808417, at *9 (citing *In re Enron*, 2007 WL 5023541 at *9; *Wilson v. Sundstrand Corp.*, No. 99-C-6944, 2003 WL 22012673, at *7 (N.D. Ill. Aug. 25, 2003); *Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*, No. CV 00-1693-PA, 2003 WL 23715981, at *2 (D. Or. Jan. 21, 2003)); *see also Rollins v. Mr Heather, Inc.*, No. 1:16-cv-01834-JEO, 2018 WL 11454741, at *10 N.D. Ala. Sep. 11, 2018) ("The mere fact that the Supplemental Report was done in response to questioning by Defendants does not make it improper…"); *CTI Sys., S.A. v. Glob. Finishing Solutions., LLC*, 2016 WL 110605, at *5 (W.D. Wis. Jan. 8, 2016) (supplementation can be proper "to correct mistakes and oversights."); *Alfen v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 12930737, at *3 (C.D. Cal. Nov. 9, 2012) ("[T]he sur-rebuttal reports address issues raised by Toyota's rebuttal expert reports . . . . Thus, the reports are proper subjects for rebuttal expert testimony."); *Gilbane Bldg. Co. v. Downers Grove Cmty. High Sch. Dist. No. 99*, No. 02 C 2260, 2005 WL 838679, at *8 (N.D. Ill. Apr. 5, 2005) ("Depending on the facts of the case, a revised expert report that utilizes an additional method of analysis and offers additional conclusions that were not part of the original report may also constitute a supplemental report," so long as it is "consistent with the core opinions expressed in the original expert report.").

### A.    Dr. Burch's February 6 Report

Under Rule 26(e)(1) a party is under a duty to supplement an expert disclosure if the party "learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." In this case, Dr. Burch's February 6 Report involves the correction of a calculation error, and analyses flowing from the correction of that error. Dr. Burch was unaware of that error until service of Dr. Swanson's Report. To strike Dr. Burch's

13

February 6 Report and bar her from correcting her error and addressing its ramifications would effectively preclude Plaintiffs from presenting expert testimony on the relative rates of voter turnout among Black and white Mississippians, an issue the Fifth Circuit has found to be significant in cases under Section 2 of the Voting Rights Act. *See Fordice*, *supra*.

Dr. Traci Burch is an Associate Professor of Political Science at Northwestern University. She holds an undergraduate degree from Princeton University and a doctoral degree from Harvard University,[3] and has been qualified multiple times as an expert in Voting Rights Act litigation.[4]

As noted above, among the opinions Dr. Burch offered in her initial report was that Black Mississippians vote at a lower rate of turnout than white Mississippians, and that this lower turnout rate could be explained by the disparity in educational attainment, itself a predictor of political participation across racial groups and a legacy of the institutional discrimination faced by Black Mississippians.

---

[3]  Traci Burch, Northwestern Department of Political Science,
https://polisci.northwestern.edu/people/core-faculty/traci-burch.html

[4]  *E.g.*, *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 807-08 (M.D. La.) ("An Associate Professor of Political Science at Northwestern University who has testified in several federal court cases related to voting rights, Dr. Burch testified that she was asked to evaluate the Senate Factors relevant to this case in Louisiana, particularly Factors 5, 6, 7, 8, and 9."), *cert. granted before judgment*, 213 L. Ed. 2d 1107 (2022); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1320 (N.D. Ga. 2022) ("Moreover, political science professor Dr. Traci Burch was offered as an expert in political behavior, barriers to voting, and political participation. She explained that disparities . . . are often caused by public policies and demonstrate a lack of responsiveness by public officials to the needs of Black Georgians."); *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1220 n.86 (N.D. Fla.) ("I credit the testimony of Dr. Traci R. Burch, the professor responsible for this research."), *rev'd and vacated on other grounds sub nom. Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020); *People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076, 1123 (N.D. Ala. 2020) ("Dr. Tracy Burch, the plaintiffs' expert on political science and political participation, testified that 'Black Alabama adults at high-risk for severe illness from COVID-19 are far less able to satisfy these requirements for absentee voting than high-risk White Alabama adults.'").

Mississippi does not maintain official records of voter turnout by race, so to opine on differential turnout levels by race, a social scientist must analyze data from other sources. Burch Feb. 6 Rpt., p. 1, Dkt. #119-8 Ex. G. In her initial report, Dr. Burch utilized data from the Current Population Survey ("CPS"), a survey sponsored by the U.S. Census Bureau and the U.S. Bureau of Labor Statistics, which asks survey respondents to self-report their voting behavior. Burch Feb. 6 Rpt., p. 3-4, Dkt. #119-8 Ex. G. In the course of analyzing the CPS data tables, however, Dr. Burch made an error that resulted in the inclusion of one data cell containing information regarding 15–17 year old survey respondents being included in calculations that were intended to be restricted to persons of voting age. *Id.* And, because persons under 18 do not vote, the erroneous inclusion of this data skewed the results of the analysis, such that it appeared CPS showed lower rates of voter participation among the correct (18+) population than in fact was the case. *Id.* This was not discovered prior to service of Dr. Burch's initial report on October 6, 2022. *Id.*

Defendants' expert, Dr. David Swanson, identified this error in his report, served January 6, 2023. Upon receipt, Dr. Burch reviewed the report and was made aware of the error. *Id.* However, with the error corrected, the data as presented by Dr. Swanson indicated a combined Black and white turnout rate of approximately 70%, which is 12% in excess of the rate of total voter turnout, 58.7%, reflected in data maintained by the Mississippi Secretary of State. Burch Feb. 6 Rpt., p. 2-3, Dkt. #119-8 Ex. G. This, then, indicated a more basic problem with the reliability of CPS data: The self-reported survey responses for Mississippi systematically and significantly over-report voter participation, an issue that was masked by the calculation error in Dr. Burch's initial report, which drove down the overall the turnout rate. *Id.* at 6. Because of this, Dr. Burch investigated the scholarly literature regarding CPS and found that researchers had only recently determined that the over-reporting of turnout in CPS is differentiated by race, such that

the CPS data consistently overestimates Black turnout more so than it does white turnout. *Id.* at 2-3.

In light of this, Dr. Burch investigated alternative sources that do not depend on self-reporting of turnout. First, Dr. Burch examined the 2020 Cooperative Election Study ("CES"), a survey that independently validates responses by attempting to match respondents to a database of registered voters, using logit regressions.[5] *Id.* at 4-6. Second, Dr. Burch examined the Mississippi voter file, employing ecological inference, a statistical methodology often used to estimate voting behavior, to determine voter turnout by race.[6] *Id.* at 9-11. Both methods of analysis yielded significant racial gaps in turnout, with white Mississippi citizens more likely to vote than their Black counterparts. *Id.* at 11-12. The figures produced by these analysis were also closer to the actual turnout numbers shown in official Secretary of State data. *Id.* at 10-11.

---

[5] The CES dataset (formerly CCES) used by Dr. Burch is a reliable source frequently relied upon by academics. *See, e.g.*, Abhay P. Aneja et. al., *Financial Inclusion in Politics*, 97 N.Y.U. L. Rev. 566, 630 n.106 (2022); Bertrall L. Ross II, Douglas M. Spencer, *Passive Voter Suppression: Campaign Mobilization and the Effective Disfranchisement of the Poor*, 114 Nw. U. L. Rev. 633, 646, 657 (2019); Stephen Ansolabehere & Nathaniel Persily, *Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification Requirements*, 121 Harv. L. Rev. 1737, 1742 (2008). As Dr. Burch explains, the CES survey data is validated against registration and turnout data reported by the states, as maintained in the Catalist database—the same data source used by Dr. Ansolabehere in *Veasey*.

[6] Ecological inference is one of several reliable methods for ascertaining voting patterns by race, including for purposes of assessing voter registration and turnout. *See Veasey v. Abbott*, 830 F.3d 216, 250–51 (5th Cir. 2016) (en banc); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 787 (5th Cir.) (endorsing the district court's reliance on "ecological regression" to conclude that there was a "strong relationship between race/ethnicity and voting patterns"), *on reh'g*, 999 F.2d 831 (5th Cir. 1993). The en banc court relied on expert testimony applying ecological inference and affirmed that "the record contains evidence that minority voters generally turn out in lower numbers than non-minority voters and that State-sponsored discrimination created socioeconomic disparities, which hinder minority voters' general participation in the political process." *Id.* at 259-61. Similarly, the Fifth Circuit in *Thomas v. Bryant* endorsed the use of "ecological inference" to estimate voter turnout in Mississippi. *Thomas v. Bryant*, 938 F.3d 134, 163 (5th Cir. 2019) *vacated as moot sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020) (en banc).

Here, Dr. Burch's February 6 report "respon[ds] to questions or challenges to the expert's opinion raised by the opposing party," a situation where "[s]upplementation may be proper." *In re Enron*, 2007 WL 5023541, at *9; *see also Talbert v. City of Chi.*, 236 F.R.D. 415, 419 (N.D. Ill. 2006) (rejecting argument that expert could not supplement because he "should have gotten 'it right the first time'"); *Weyerhaeuser*, 2003 WL 23715981, at *2 ("I will not exclude [supplemental expert] evidence simply because Plaintiffs failed to anticipate the need for it until the defect was pointed out by their opponent. The court is not grading a law school moot court exercise."). And, unlike in the cases Defendants cite, Dr. Burch's February 6 Report was submitted well within the discovery deadline and prior to expert depositions or any related motion practice. *See, e.g.*, *Talbert*, 236 F.R.D. at 424 (noting that cases cited in favor of striking supplemental expert disclosures involved reports served after "the close of expert discovery" and in one case, "*one week into trial*") (emphasis in original).

Finally, while seeking to strike Dr. Burch's February 6 Report in its entirety, Defendants do not challenge the final section of this report, titled "Black Voter Suppression and Experiences with In-Person Voting." Burch Feb. 6 Rpt., p. 12-13, Dkt. #119-8 Ex. G . This section responds to Dr. Swanson's opinion that relative proximity of Black and white voters in Mississippi to polling places indicates the absence of voter suppression or systematic disenfranchisement. *See* Swanson Rpt., p. 43, Dkt. #119-5 and 199-6 Exs. 5, 6. This section of Dr. Burch's February 6 Report is proper rebuttal and Defendants do not contend otherwise. Thus, in all events, Defendants have offered no grounds for this Court to strike this section of Dr. Burch's February 6 Report.

### B.    Dr. Orey's February 6 Report

Defendants devote little attention to the three paragraphs of Dr. Orey's report they seek to strike. As Dr. Orey states in his February 6 Report, the section of this report expressly responds to Defendants' expert Dr. Bonneau's opinion that racial polarization in voting in Mississippi is

"largely on the basis of political party." Orey Feb. 6 Rpt., ¶ 5, Dkt. #119-1 Ex. A, quoting Bonneau Rpt. ¶ 56, Dkt. #119-7 Ex. F. Dr. Orey did not use any new methodology; he employed the same ecological inference analysis as in his initial report on a small number of additional contests. Orey Feb. 6 Rpt., ¶¶ 6–8 & tbl. 1, Dkt. #119-1 Ex. A. This is proper rebuttal. *See Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013) ("A rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert"). To the extent it could be viewed as supplementation, "the supplementation is not inappropriate because it was based on information available when the initial report was produced, or because it 'bulked' up or improved upon the original version." *Talbert*, 236 F.R.D. at 424.

## II. THE RELEVANT FACTORS WEIGH IN FAVOR OF DENYING DEFENDANTS' MOTION

Should the Court find the challenged disclosures to be untimely, it must then consider the following factors in determining whether they should be stricken: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman*, 893 F.2d at 790-91. These factors favor Plaintiffs and counsel against the drastic remedy of striking the disclosures and testimony at issue.

### A. The Explanation For The Challenged Disclosures Favors Plaintiffs

Defendants argue there is no reasonable explanation for Dr. Burch's "failure to do the careful, thorough work needed to supply 'full and complete' disclosures by the October 3, 2022 deadline." Mem. 12. But all that means, in substance, is that Dr. Burch made an error that was not discovered prior to service of her report.

A good-faith mistake should not be fatal. *In re Enron* is instructive in this regard. There, a defendant submitted a supplemental expert report from a second expert to correct an error made by the first expert that was uncovered in an opposing expert's deposition. *In re Enron*, 2007 WL 5023541, at *3. The report was submitted "nearly four months after the . . . deadline for Defendants to submit expert reports and less than twelve hours before [the first expert's] scheduled deposition." *Id.* In considering whether to exclude the supplemental report, the court found any noncompliance with the scheduling order to be harmless, noting that "although . . . the data was available . . . at the time [the experts] submitted their original expert reports, there is no evidence that [the second expert] acted in bad faith in submitting his supplemental report shortly after" the mistake was uncovered. *Id.* at *10. The untimeliness of the disclosure of additional data "correcting [the expert's] flawed comparison and supporting her theory and her basic conclusion" was due to the expert's "lack of awareness that the original comparison was faulty or would be in dispute." *Id.*; *see also Weyerhaeuser*, 2003 WL 23715981, at *2 (declining to exclude supplemental disclosure "simply because Plaintiffs failed to anticipate the need for it until the defect was pointed out by their opponent").

This case is an even easier call. Dr. Burch's February 6 report, addressing her calculation error and its consequences, was served promptly after Plaintiffs became aware of the error by way of Dr. Swanson's report. Plaintiffs gain no tactical or other improper advantage from this sequence of events, and seek only to present admissible testimony that furthers an important element of their case. A technical mistake in calculation in an initial report, even one with significant consequences, should not be grounds for the drastic remedy of excluding subsequent disclosures that correct and address the error.

As to Dr. Orey, Defendants' argument appears to be that the challenged paragraphs in his February 6 report somehow "rebut" an opinion of another of Plaintiffs' experts, former Mississippi Supreme Court Justice Oliver Diaz, because Justice Diaz's report notes that "[p]arty politics continue to play a major role in judicial elections in general, and even more acutely in elections to the Supreme Court." Mem. 13, quoting Diaz Rpt., ¶ 38, Dkt. #69-11 Ex. K. In the quoted portion of his report, Justice Diaz states that despite Supreme Court elections being nonpartisan, political parties and leading party figures continue to endorse and support particular candidates. *See* Diaz Rpt., ¶¶ 40-43, Dkt. #69-11 Ex. K. This fact, however, does not explain whether race or partisanship drives the polarization of Black and white Mississippi voters, and thus Dr. Orey's analysis in no way "rebuts" it. In any event, to the extent Defendants wish to raise such arguments, those go to the merits, not to the procedural matters at issue here. *See Foradori v. Captain D's LLC*, No. CIV.A. 1:03CV669-M-D, 2005 WL 5976559, at *1 (N.D. Miss. Aug. 3, 2005) (*Daubert* motion, not motion to strike, is proper vehicle to challenge the substance of expert disclosures).

## B. The Importance Of The Challenged Testimony

As regards the importance of the testimony Defendants seek to exclude, they assert that "[t]he instant motion does not seek to prevent Dr. Burch or Dr. Orey from testifying *at all* at trial, nor does it seek to strike their initial reports or any part of Dr. Orey's rebuttal report or corrected rebuttal report beyond those portions identified herein. At most, this factor is neutral." Mem. 13. (emphasis in original). But the question of relative voter turnout rates by race, at issue in Dr. Burch's challenged disclosure, has been found to be significant by the Fifth Circuit in analyzing the Senate Factors in voting rights litigation. *See Fordice*, *supra*. Striking Dr. Burch's disclosure will leave Plaintiffs with no expert evidence on this topic. Thus, notwithstanding that Defendants do not seek to strike Dr. Burch's testimony as it regards other matters relevant to this case, striking the testimony at issue here could have a material impact on Plaintiffs' case. This weighs against

granting Defendants' motion.  *See Verzwyvelt v. St. Paul Fire & Marine Ins. Co.*, 204 F.R.D. 309, 311 (W.D. La. 2001) (expert disclosure should not be stricken where doing so would "significantly impair [Plaintiffs'] ability to prove their case").

As to the challenged three paragraphs of Dr. Orey's report, while the impairment to Plaintiffs' case from granting the motion to strike would not be as severe, the Fifth Circuit has also identified the question of whether partisanship or race drives observed polarized voting as an important (and potentially dispositive) one.  *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc).  Dr. Orey's testimony on this point is accordingly important, and he should not be constrained from referring to *all* of the election contests he analyzed in addressing the point.

### C.    Potential Prejudice

Nor do Defendants identify the sort of potential prejudice that warrants exclusion.  The challenged disclosures were made well within the discovery period, before any experts were deposed and before any *Daubert* or summary judgment motion practice (none of which have yet occurred).  The challenged disclosures were made 10 months before the start of trial under the existing Case Management Order, and as of the filing of this memorandum over eight months remain before trial.  The challenged disclosures involve, at most, analysis of a limited number of new data sets; they do not inject new issues into the case or change the scope of any expert's intended testimony.  And, this case has been pending for less than a year without any extension of the overall schedule having been sought or received, so there is minimal prejudice to any party from potential modification to the schedule, should any be necessary.

Thus, as to both substance and timing, this case fall well within the ambit of those authorities in which this factor weighs against striking or excluding challenged disclosures.  *See, e.g.*, *Jagneaux v. United Rentals (N. Am.), Inc.*, No. 1:18CV186-LG-RHW, 2020 WL 1821256, at

*5 (S.D. Miss. Apr. 10, 2020) ("Baker's placement of the pin for his first tests was apparently due to his misunderstanding of McGowen's testimony; an error that could and should have been corrected independently of Liebkemann's analysis. Nevertheless, Baker's second round of testing would provide helpful information to the jury … Given that this case is six months from trial, there is ample time for additional discovery to cure any prejudice. For these reasons, Baker will be allowed to testify regarding the opinions and conclusions in his rebuttal report."); *Verzwyvelt*, 204 F.R.D. at 311 ("Also, because almost three (3) months remain before trial, plaintiffs have time to depose Phebus and prepare for trial, thereby mitigating any real or material prejudice to plaintiffs as a result of defendant's delay in rendering and correctly identifying the expert reports.").

As to Dr. Burch, Defendants focus on the claimed additional time and expense that responding to her February 6 Report would entail. But as an initial matter, the additional time necessitated by the calculation error in Dr. Burch's initial report is the time expended in identifying and explaining this mistake, not the time associated with responding to Dr. Burch's subsequent analysis, after the mistake has been corrected. Had Dr. Burch uncovered the calculation error prior to service of her initial report, she would have undertaken the analyses set forth in her February 6 report at that time and incorporated her results into that first report. Costs associated with responding to this analysis would therefore not "have been avoided by an earlier disclosure." *Hoffman v. L & M Arts*, No. 3:10-CV-0953-D, 2013 WL 81578, at *2 (N.D. Tex. Jan. 8, 2013).

Moreover, the extensive time Defendants project as necessary to respond to Dr. Burch's February 6 report, citing to Dr. Swanson's accompanying declaration, arise from incomplete or otherwise flawed understandings of the analysis in Dr. Burch's February 6 report, as discussed further in Dr. Burch's March 24, 2023 declaration, submitted herewith. Among other things, certain datasets Dr. Swanson contends will take significant time to acquire are available free of

charge via easily accessible internet sources. *See* Burch Decl. ¶¶ 11, 20. Regression diagnostics Dr. Swanson asserts must be run to evaluate Dr. Burch's work are out of scope, because Dr. Burch does not purport to model every variable that predicts voting behavior, but instead to examine the relationship between voting, race, and education. *Id.* ¶¶ 13, 15. Dr. Swanson raises questions about particular data files and internet hyperlinks that could easily be resolved by contacting Plaintiffs as part of the expert discovery process, rather than by trial and error. *Id.* ¶ 18, 19. And Dr. Swanson asserts that Dr. Burch's analysis of the Mississippi voter file made use of CES data, as opposed to simply data from the voter file and demographic data from the census, resulting in a significant overestimation of the complexity of Dr. Burch's analysis and the time and effort required to replicate it. *Id.* ¶¶ 21-22. Defendants do not show the sort of undue prejudice that could warrant striking Dr. Burch's February 6 Report.

Lastly, Defendants do not seriously attempt to show prejudice as it relates to Dr. Orey, beyond stating that considering his February 6 report will require "additional research and analysis." Mem. 16. This conclusory assertion bears little weight, and given the absence of any other identified form of cognizable prejudice, this factor plainly favors Plaintiffs.

### D. The Availability Of A Continuance

The Fifth Circuit has "repeatedly stated that a continuance is the preferred method of dealing with a party's attempt to designate a witness out of time." *In re Complaint of C.F. Bean*, 841 F.3d at 374 (internal quotations omitted). Here, with over eight months before trial, there is ample time for Defendants to serve any further disclosures and conduct any further expert discovery the Court may deem warranted, without impacting the trial date. Defendants themselves seek a suspension of "remaining case management deadlines pending a ruling on the instant motion" (Mem. 17)—a request Plaintiffs do not oppose—as well as an extension as an alternative form of relief. *See id.* ("In the event the motion is denied in whole or in part, Defendants request

a reasonable extension of time for their experts to prepare written surrebuttals to any unstricken portions of the rebuttal reports of Dr. Burch and Dr. Orey.").

A continuance or other extension of time is particularly appropriate here because (i) this case has been on the Court's docket for less than one year; (ii) there have thus far been no requests for extensions of any kind, save for the agreed 36-day extension for Defendants to serve their expert disclosures; and (iii) discovery has not yet closed, the relevant expert witnesses have not been deposed, and neither summary judgment nor *Daubert* motions have yet been filed. Thus, providing additional time for completion of any further expert discovery will not result in the sort of extensive duplication of effort that could be required if disclosures had been made at a later stage of the proceedings. Nor will it result in the case burdening this Court's docket for an undue length of time. *Compare Verzwyvelt*, 204 F.R.D. at 311 (finding continuance appropriate where "the noncompliance in this case was limited to this single instance, and all other discovery has proceeded apace and without significant interruption.") *with Cooper v. Meritor, Inc.*, No. 4:16-CV-52-DMB-JMV, 2020 WL 5765004, at *5 (N.D. Miss. Sept. 28, 2020) (finding this factor favored exclusion where, unlike here, "this matter has been ongoing for many years and all deadlines have already been subject to continuances") (internal quotation omitted).

Defendants contend only that a continuance "would not cure the prejudicial expenditures of time and money," and thus "would not be helpful." Mem. 17, quoting *Raymond James Trust, N.A., Trustee of E.C. Care Trust v. Natchez Hosp. Co.*, No. 5:19-CV-103-DCB-MTP, 2021 WL 2556593, at *4 (S.D. Miss. June 22, 2021). In *Raymond James*, however, all factors favored striking the disclosure at issue and the court relied on "the fundamental unfairness of a treating physician's longstanding opinion being changed late in litigation well after court imposed deadlines" in reaching its conclusion. *Id.* And an extension of time typically will not cure

expenditures of time and money; if this were itself grounds to deny a continuance, this "preferred method" of the Fifth Circuit for dealing with disclosure deficiencies (*C.F. Bean*, *supra*) could rarely be granted.

Finally, while Plaintiffs do not believe a continuance of the trial date is necessary given the time remaining before trial, should the Court deem a continuance of the trial date appropriate in these circumstances, that remedy is more just and appropriate than is exclusion of significant expert testimony on procedural grounds.

## CONCLUSION

Defendants' motion should be denied.

Respectfully submitted the 24th day of March, 2023,


/s/ Joshua Tom

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI FOUNDATION | ACLU FOUNDATION |

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
Lakyn Collier (Miss. Bar No. 106224)
Vara Lyons*
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
*JTom@aclu-ms.org*
*Lcollier@aclu-ms.org*
*Vlyons@aclu-ms.org*

ACLU FOUNDATION
Ari J. Savitzky*
Sophia Lin Lakin*
Ming Cheung*
Kelsey A. Miller*
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
*asavitzky@aclu.org*
*slakin@aclu.org*
*mcheung@aclu.org*
*kmiller1@aclu.org*

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (Miss. Bar No. 106441)
Isaac Rethy*
425 Lexington Avenue
New York, NY 100017
(212) 455-2000
*jyoungwood@stblaw.com*
*irethy@stblaw.com*

SOUTHERN POVERTY LAW CENTER
Jade Olivia Morgan (Miss. Bar No. 105760)
Leslie Faith Jones (Miss. Bar No. 106092)
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
*jade.morgan@splcenter.org*
*leslie.jones@splcenter.org*

Bradley E. Heard*
Ahmed Soussi*
Sabrina Khan*
150 E Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(470) 521-6700
*bradley.heard@splcenter.org*
*ahmed.soussi@splcenter.org*
*sabrina.khan@splcenter.org*

* Admitted *pro hac vice*


*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I, Joshua Tom, hereby certify that on March 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.

<u>/s/ Joshua Tom</u>
Joshua Tom
